# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

THE MEDICAL COLLEGE OF
WISCONSIN INC.,

                    Plaintiff,

v.

ATTACHMATE CORPORATION,

                    Defendant.

Case No. 15-CV-151-JPS

ORDER

  This case arises out of a software licensing dispute. *(See generally* Docket #1). Plaintiff, The Medical College of Wisconsin, Inc. ("Medical College"), filed its complaint on February 5, 2015, alleging that Defendant, Attachmate Corporation ("Attachmate"), violated both the Wisconsin Deceptive Trade Practices Act (Wis. Stat. Ann. § 100.18(1)) and the implied covenant of good faith and fair dealing. (*See* Docket #1 ¶¶ 58-69). The Medical College also sought declarations that it did not infringe Attachmate's software copyrights and did not breach the parties' software licenses, otherwise known as End User License Agreements ("EULA"). (Docket #1 ¶¶ 32-42). Attachmate counterclaimed with breach of contract and copyright infringement claims. (Docket #38 ¶¶ 35-50).

  Currently before the Court are three motions: (1) Attachmate's motion to dismiss the Medical College's Wisconsin Deceptive Trade Practices Act ("WDTPA") claim pursuant to Federal Rule of Civil Procedure 12(b)(6); (2) Attachmate's motion for partial summary judgment pursuant to Federal Rule

of Civil Procedure 56;[1] and (3) the Medical College's motion for summary judgment, also brought pursuant to Federal Rule of Civil Procedure 56.[2] (Docket #28, #41, #46).

For the reasons outlined below, the Court will: (1) grant Attachmate's motion to dismiss the WDTPA claim (Docket #28); (2) grant in part and deny in part Attachmate's motion for partial summary judgment (Docket #41); and (3) deny the Medical College's motion for summary judgment in its entirety (Docket #46). Therefore, the live issues remaining after summary judgment in this case are: (1) whether the Medical College breached its duty to implement internal safeguards to prevent unauthorized copying, distribution, or use of Reflection software under Section 4 of the EULA; (2) the determination of an appropriate damage award for the Medical College's breach of Section 1 of the EULA; and (3) liability and damages with respect to Attachmate's copyright claim.

---

[1]Specifically, Attachmate argues that it is entitled to summary judgment on liability only with respect to its breach of contract claim. (Docket #41). Moreover, it argues that there is no evidence to support the Medical College's claims that Attachmate: (1) breached the implied covenant of good faith and fair dealing; or (2) violated the WDTPA, and thus the Medical College's claims based on those two legal theories should be dismissed on summary judgment as well. (Docket #41). Attachmate does *not* move for summary judgment with respect to: (1) damages for the alleged breach of contract; or (2) its copyright claim. (Docket #41).

[2]The Medical College moves for summary judgment with respect to its WDTPA and implied covenant of good faith and fair dealing claims along with Attachmate's breach of contract and copyright infringement claims. (Docket #46).

Case 2:15-cv-00151-JPS   Filed 02/19/16   Page 2 of 45   Document 113

1.      MOTION TO DISMISS[3]

1.1      Background

Attachmate asks this Court to dismiss the Medical College's WDTPA claim. (Docket #28). Before delving into the legal arguments underlying the motion, the Court will first provide an overview of: (1) the parties; and (2) the Medical College's allegations with respect to this claim. The relevant facts for the purpose of this portion of the Court's Order will be taken from the complaint. (*See* Docket #1); *see also Rosenblum v. Travelbyus.com Ltd.*, 299 F.3d 657, 661 (7th Cir. 2002) ("As a general rule, on a Rule 12(b)(6) motion, the court may consider only the plaintiff's complaint.").

1.1.1    The Parties

The Medical College is a Wisconsin corporation existing under the laws of the State of Wisconsin with its principal place of business located at 8701 Watertown Plank Road, Milwaukee, Wisconsin 53226. (Docket #1 ¶ 1). It operates as a not-for-profit corporation dedicated to clinical care, research, community engagement, and the education of physicians and scientists. (Docket #1 ¶ 9).

Attachmate is a corporation existing under the laws of the State of Washington, with its principal place of business located at 705 5th Avenue South, Suite 1100, Seattle, Washington 98104. (Docket #1 ¶ 2). Attachmate is the creator and licensor of a software line called "Reflection." (Docket #1 ¶ 12). The Reflection line of software comprises various products, including, but not limited to: (1) Reflection for HP Version 10.0; (2) Reflection for IBM

---

[3]Because of the different standards and bodies of fact applicable to the pending motion to dismiss and motions for summary judgment, the Court will address these motions separately.

Case 2:15-cv-00151-JPS   Filed 02/19/16   Page 3 of 45   Document 113

Version 10.0; (3) Reflection for UNIX and Open VMS Version 10.0; (4) Reflection for UNIX and Open VMS 2014 Version R1; and (5) Reflection X Versions 6.00 and 10.0. (Docket #1 ¶ 12). Generally, Reflection products allow Windows-based devices to connect to non-Windows-based operating systems. (Docket #1 ¶ 13). This is known as "terminal emulation" software. (Docket #1 ¶ 13).

### 1.1.2 The Facts

Beginning in or about 2002, the Medical College began to purchase certain Reflection software from Attachmate. (Docket #1 ¶ 12). Since that time, the Medical College has purchased at least 764 licenses to different versions of Reflection software from Attachmate. (Docket #1 ¶ 14).

The parties' relationship continued at arms length until approximately September of 2014. (Docket #1 ¶ 14). At that time, Attachmate requested the Medical College to conduct an audit to determine whether there was any discrepancy between the number of software licenses that the Medical College owned and the number of licenses that the Medical College deployed. (Docket #1 ¶¶ 15-17). The Medical College complied with that audit in or about October of 2014. (Docket #1 ¶ 16).

Using the audit data, Attachmate sent the Medical College a table which compared: (1) the number of "installations" of the various types and versions of Reflection software found on the Medical College's computers; and (2) the number of licenses owned by the Medical College. (Docket #1 ¶ 17). This table showed a number of discrepancies. (Docket #1 ¶ 17). Specifically, Attachmate reported that while Reflection X was installed on 2,505 computers, the Medical College had purportedly only purchased 7 licenses for that particular software. (Docket #1 ¶ 18). In addition, the audit

purportedly showed that two other programs—for Reflection for HP (version 10.0) and Reflection for IBM (version 10.0)—were installed but were not licensed by the Medical College. (Docket #1 ¶ 19). Though the Medical College owned 764 licenses for the Reflection line of software, 750 of those licenses were allegedly not "installed." (Docket #1 ¶ 20).

In total, based on the audit, Attachmate represented that the Medical College had installed at least 2,500 Reflection[4] programs that it had not purchased. (Docket #1 ¶ 21). In order to bring the Medical College back into compliance with the Reflection software license, Attachmate represented that the Medical College needed to purchase $1,067,416.00 worth of additional licenses—plus a 12% interest charge going back to the release dates of the software—for a total of $2,604,495.04. (Docket #1 ¶ 26). Attachmate demanded full payment within thirty (30) days. (Docket #1 ¶ 27).

The Medical College disagreed with Attachmate's findings. Specifically, the Medical College claimed that Attachmate failed to account for the licenses that the Medical College *already* owned and *actually* used. (Docket #1 ¶¶ 22-23). If Attachmate would have taken this information into account, the Medical College claims that Attachmate would have found that the Medical College used Reflection software consistent with the number of licenses that it owned. (Docket #1 ¶ 24). Moreover, despite its own best efforts, the Medical College asserts Attachmate refused to work cooperatively to resolve any issues raised by the audit in a "fair and equitable manner under the circumstances." (Docket #1 ¶¶ 28, 31). At bottom, the

---

[4]As outlined in the paragraph above, the specific Reflection products at issue were Reflection for HP (version 10.0), Reflection for IBM (version 10.0), and Reflection X (version 10.0). (Docket #1 ¶ 26).

Medical College claims to be a victim of Attachmate's "history of assuming circumstances concerning an alleged over-deployment of its software products so as to maximize its claim for license fees and interest from its customers…." (Docket #1 ¶ 25). Further, the Medical College claims that Attachmate's business strategy was merely "an effort to unjustly reap a windfall from [its] customers." (Docket #1 ¶ 25).

### 1.2 Legal Standard

"A motion to dismiss pursuant to [Rule] 12(b)(6) challenges the viability of a complaint by arguing that it fails to state a claim upon which relief may be granted." *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014). "To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must state enough facts that, when accepted as true, 'state a claim for relief that is plausible on its face.'" *Spierer v. Rossman*, 798 F.3d 502, 510 (7th Cir. 2015) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *McCauley v. City of Chicago*, 671 F.3d 611, 615 (7th Cir. 2011) (citing *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)). The Court must "tak[e] all factual allegations as true and draw[] all reasonable inferences in favor of the plaintiffs." *Pugh v. Tribune Co.*, 521 F.3d 686, 692 (7th Cir. 2008).

### 1.3 Analysis

The Medical College claims that Attachmate violated the WDTPA by "ma[king] untrue, deceptive, or misleading representations in an attempt to sell additional [software] licenses." (Docket #1 ¶ 67). Attachmate, however, asks this Court to dismiss the Medical College's WDTPA claim pursuant to Rule 12(b)(6). (Docket #28). In support of its motion, Attachmate argues that

the Medical College's claims arise out of the parties' pre-existing contractual relationship; in other words, according to Attachmate, since the purported misrepresentations were not made to "the public," Attachmate cannot be liable as a matter of law under the WDTPA.[5] (Docket #29 at 1). The Medical College opposes[6] Attachmate's motion by arguing that the representations in question were made with respect to *new* offers to form *new* contracts. *(See* Docket #11 at 10-13). Under this theory, even if the parties were bound by contract with respect to their prior licensing agreements, the Medical College was a member of "the public" for the purpose of the negotiations that underlie the instant WDTPA claim. (Docket #11 at 10-13).

The WDTPA provides that:

> No…corporation…with intent to sell…merchandise…to the public for sale,…shall make, publish, disseminate, circulate, or place before *the public*,…in this state, in a newspaper, magazine or other publication, or in the form of a book, notice, handbill, poster, bill, circular, pamphlet, letter, sign, placard, card, label, or over any radio or television station, or in any other way similar or dissimilar to the foregoing, an advertisement, announcement, statement or representation of any kind… which…is untrue, deceptive or misleading.

---

[5]Attachmate also argues that the Medical College's WDTPA claim is: (1) inadequately pled under Rule 9(b) or, in the alternative, Rule 8(a); and (2) that the Medical College did not properly allege that Attachmate induced the Medical College to act or caused pecuniary harm. (Docket #29 at 1). The Court will not address these pleading-related arguments because, as more fully described below, even if the Medical College had properly pled its claims, it could not maintain a WDTPA claim against Attachmate in light of the parties' relationship.

[6]This motion to dismiss was originally filed by Attachmate on May 1, 2015. (Docket #6). However, in light of the parties' joint request to mediate, the Court denied that motion without prejudice. (Docket #22). After mediation was unsuccessful, Attachmate re-filed its motion to dismiss. (Docket #29). Thereafter, the Medical College renewed its response to the original motion. (*See* Docket #33). Attachmate likewise renewed its reply. (*See* Docket #34).

Wis. Stat. Ann. § 100.18(1) (emphasis added). In order to bring a claim of fraudulent misrepresentation under Section 100.18(1), a plaintiff must prove: (1) "that with the intent to induce an obligation, the defendant made a representation to '*the public*'"; (2) "that the representation was untrue, deceptive or misleading"; and (3) "that the representation caused the plaintiff a pecuniary loss." *K & S Tool & Die Corp. v. Perfection Machinery Sales, Inc.*, 2007 WI 70, ¶ 19, 301 Wis.2d 109, 121–122, 732 N.W.2d 792, 798 (emphasis added). Attachmate's motion challenges the Medical College's ability to satisfy the first element of its WDTPA claim as a matter of law. *(See generally* Docket #29).

The WDTPA does not define the meaning of "the public." *Fricano v. Bank of Am. NA*, 2016 WI App 11, ¶ 28, —Wis. 2d—, —N.W. 2d—. Over the years, however, Wisconsin courts have added interpretive gloss to this statutory phrase, *see State of Wisconsin v. Automatic Merch of Am.*, 64 Wis. 2d 659, 664, 221 N.W. 2d 683, 686 (1974), much of which has resulted in an expansion of liability under the WDTPA. For example, "the public" need not "mean a large audience, and a statement made to one person may constitute a statement made to 'the public' under this statute." *Kailin v. Armstrong*, 2002 WI App 70, ¶ 44, 252 Wis. 2d 676, 709, 643 N.W.2d 132, 149. Moreover, actionable representations are "not limited to media advertising," *Automatic Merchandisers of Am., Inc.*, 64 Wis. 2d at 663, and need not be made in the context of advertisements at all, *Bonn v. Haubrich*, 123 Wis. 2d 168, 173, 366 N.W.2d 503, 505 (Ct. App. 1985) (holding that actionable conduct may also be made to "the public" in the context of individual, oral sales promotions).

Notwithstanding the broad applicability of Section 100.18, the Wisconsin Supreme Court placed a limit on the reach of the WDTPA: "a person remains a member of 'the public' until a 'particular relationship'" exists between the parties. *Fricano v. Bank of Am. NA*, 2016 WI App at ¶ 28 (citing *K & S Tool & Die Corp.*, 301 Wis.2d 109, ¶ 27); *see also State v. Automatic Merchandisers of Am., Inc.*, 64 Wis. 2d 659, 664, 221 N.W.2d 683, 686 (1974) ("The important factor is whether there is some *particular relationship* between the parties.") (emphasis added). "[A] plaintiff is no longer a member of 'the public' for the purpose of Wis. Stat. § 100.18(1) once he or she has entered into a contract to purchase the offered item." *K & S Tool & Die Corp.*, 2007 WI 70, ¶ 26. Courts applying the "particular relationship" test observe that rule recognizes "that those who have long-term, established relationships are in a better position than most to protect themselves in the context of that relationship." *Uniek, Inc. v. Dollar General Corp.*, 474 F. Supp.2d 1034, 1039 (W.D. Wis. 2007). Moreover, "[s]tatements made by the seller *after* a person has made a purchase or entered into a contract to purchase logically do not cause the person to make the purchase or *enter* into the contract." *Kailin*, 2002 WI App 70, ¶ 44 (emphasis added).

The contours of the "particular relationship" test are purposefully ill-defined. *K & S Tool & Die Corp.*, 301 Wis. 2d 109, ¶ 24-27 ("The use of 'the public,' in the context of § 100.18(1)…d[oes] not lend itself to the formulation of a bright-line test."). Determining whether a person is a member of "the public" is ultimately a case-specific inquiry that depends upon the "peculiar facts and circumstances" of the parties' relationship "and must be tested by the statute in the light of such facts and circumstances." *Id.* (internal citations omitted). Thus, while the question of whether a particular plaintiff qualifies

Case 2:15-cv-00151-JPS   Filed 02/19/16   Page 9 of 45   Document 113

as the public is "not a pure issue of law," *Roundy's Supermarkets, Inc. v. Nash-Finch Co.*, No. 08C0142, 2008 WL 5377907, at *3 (E.D. Wis. Dec. 23, 2008), it can be decided by the Court where "the undisputed facts establish that the plaintiff had a particular relationship with" the defendant, *Bates v. Wisconsin-Dep't of Workforce Dev.*, 636 F. Supp. 2d 797, 811 (W.D. Wis. 2009) *aff'd sub nom. Bates v. Wisconsin Dep't of Workforce Dev.*, 375 F. App'x 633 (7th Cir. 2010). *Compare Northcentral Tech. Coll. v. Doron Precision Sys., Inc.*, No. 13-CV-425-SLC, 2013 WL 5719459, at *3 (W.D. Wis. Oct. 21, 2013) (dismissing the plaintiff's claim because the complaint alleged that the parties were under contract when the alleged representation was made) *with United Concrete & Const., Inc. v. Red-D-Mix Concrete, Inc.*, 2012 WI App 88, ¶ 16, 343 Wis. 2d 679, 819 N.W.2d 563 *aff'd in part, rev'd in part on other grnds*, 2013 WI 72, ¶ 16, 349 Wis. 2d 587, 836 N.W.2d 807 (finding that a dispute of fact about the parties' status as contracting parties rendered the question appropriate for the jury).

On the one hand, where the parties to a WDTPA claim are already bound by contract for the item in dispute, courts have found a "particular relationship" to exist and preclude a Section 100.18 claim. *See K & S Tool & Die Corp.*, 2007 WI 70, ¶ 26; *see e.g., Uniek, Inc.*, 474 F. Supp. 2d at 1040 (finding that defendant was entitled to summary judgment because after thirteen years of business dealings and the execution of a "letter of understanding" the parties had formed a "particular relationship"); *Kailin*, 252 Wis.2d 676, ¶ 44 (affirming a ruling that the plaintiffs were no longer members of "the public" with respect to statements made after the parties entered into a contract to purchase real estate). On the other hand, where the parties are not bound by contract, WDTPA claims may survive. *See, e.g., Fricano*, 2016 WI App 11, ¶ 30 (declining to overturn a jury verdict that the

parties were not in a "particular relationship" at the relevant time period because there "was no contract at the time the Bank misrepresented its knowledge of the condition of the property"). In this sense, a finding that the plaintiff is (or is not) a member of the public depends both on: (1) timing (*i.e.*, were the parties bound by contract when the defendant made the alleged misrepresentation); and (2) the items offered for sale (*i.e.*, were the parties bound by contract for the goods/services at issue). *See e.g.*, *Fricano*, 2016 WI App 11, ¶ 30 (quoted above); *MBS-Certified Pub. Accountants, LLC v. Wisconsin Bell Inc.*, 2013 WI App 14, ¶ 19, 346 Wis. 2d 173, 189, 828 N.W.2d 575, 583 (reversing a decision to dismiss a WDTPA claim because "there was no contract in place with any of the defendants *for the billed services at issue*; indeed that is crux of this suit—that MBS and others were billed for services for which they never contracted") (emphasis added); *Blanchar v. Lake Land Builders, Inc.*, 2009 WI App 21, ¶ 19, 316 Wis. 2d 357, 763 N.W.2d 249 (concluding "as a matter of law, based on the undisputed facts, that [the plaintiff] was still a member of 'the public' with respect to Lake Land at the time of [the defendant's] alleged misrepresentations").

Here, there can be no question that the Medical College and Attachmate were, at the time of the alleged misrepresentations, under contract for the items in dispute—Reflection software. (Docket #1 ¶ 12, 14-23, 64). The Medical College admits that it owns 764 licenses for Attachmate's Reflection line of terminal emulation software. (Docket #1 ¶ 14). Importantly, the alleged representations at the core of this WDTPA claim arose entirely

Case 2:15-cv-00151-JPS   Filed 02/19/16   Page 11 of 45   Document 113

out of the obligations created by those software licenses—contracts to which the Medical College agreed to be bound.[7] (Docket #1 ¶¶ 14-21).

The Medical College's position—that Attachmate's offers are now being made with respect to *new* licenses for *new* software (Docket #11 at 11-13)—misconstrues the nature of the parties' ongoing obligations to each other and the claims at issue here. *Cf. Hackel v. Nat'l Feeds, Inc.*, 986 F. Supp. 2d 963, 980 (W.D. Wis. 2013) (denying the defendant's motion for summary judgment with respect to the WDTPA claim because "[t]he parties were not in a contractual relationship and Hackel was under no obligation to make future purchases from National"). During the time in which the alleged misrepresentations occurred, the Medical College was continuing to use Attachmate's software and was, therefore, continuing to operate as bound under those software licenses. (Docket #1 ¶¶ 12, 14-23, 28). In addition, whether or not the Medical College over-deployed Reflection—and was therefore required to obtain additional licenses—turns on the language of the parties' pre-existing license agreements. (Docket #1 ¶¶ 23, 31, 64). Thus, because the Medical College argues that, at all times relevant, it has acted "consistent[ly] with the total number of license[s] [that it has] purchased," the Medical College's WDTPA claim is inextricably governed by—and bound up in—the same software licenses that it has been a party to with Attachmate for approximately 14 years. (Docket #1 ¶¶ 12, 14, 64).

---

[7] The Medical College states that it has purchased 764 licenses from Attachmate. (Docket #1 ¶¶ 12, 14, 64). Nowhere in the complaint does the Medical College allege that it was not bound by those licenses, and the Court has no independent basis from which to infer otherwise.

Page 12 of 45

The Medical College attempts to circumvent this conclusion by arguing that its relationship with Attachmate is analogous to the relationship between the parties in: (1) *MBS-Certified Pub. Accountants, LLC.*, 2013 WI App 14; (2) *Blanchar*, 2009 WI App 21; and (3) *United Concrete & Const., Inc.*, 2012 WI App 88. (Docket #11 at 11-13). These cases, however, are factually distinguishable.

Unlike the Medical College, the plaintiffs in each of the aforementioned cases had not been under contract with the defendants for the items, goods, and/or services in question at the time the alleged misrepresentations were made. For example, in *MBS* the plaintiffs alleged that certain telecommunications providers billed them for services that the plaintiffs never authorized. *MBS-Certified Pub. Accountants, LLC.*, 2013 WI App 14, ¶ 6. Although the plaintiffs were already the defendants' customers when the purported charges began to accrue, the crux of that suit was that "there was *no contract* in place with any of the defendants *for the billed services at issue.*" *Id.* at ¶ 19 (emphasis added). Similarly, in *Blanchar*, the court held the parties' *prior* land contract did not, as a matter of law, take the plaintiffs out of the realm of "the public" for the purpose of a *separate and distinct* home construction project. *Blanchar*, 2009 WI App 21, ¶¶ 12-17 (explaining that "[t]he alleged misrepresentations occurred before the parties entered into the contract at issue, the construction contract"); *see also United Concrete & Const., Inc.*, 2012 WI App 88, ¶ 16 ("A jury reasonably could find that a particular relationship existed between United and Red–D–Mix because of their past dealings; it just as reasonably could find that United was a member of 'the public' when Red–D–Mix, through Clark, solicited United's business anew").

Page 13 of 45

Unlike the cases relied upon by the Medical College, the complaint clearly states that the software representations at issue here arose out of the parties' pre-existing contractual obligations to each other. (Docket #1 ¶¶ 12-24). Thus, unlike the defendants in *MBS*, *Blanchar*, and *United Concrete*, Attachmate's licensing representations were not made in the context of a new offer for sale for new software licenses. In other words, Attachmate was not "solicit[ing]" the Medical College's "business anew." *United Concrete & Const., Inc.*, 2012 WI App 88, ¶ 16. Instead, the complaint alleges that the Medical College had maintained a business relationship with Attachmate under the terms of over 764 licenses that the Medical College had purchased since 2002. (Docket #1 ¶ 14). And, Attachmate's purported "offers" were made based on the software that the Medical College had allegedly already installed and pursuant to previously purchased license agreements. (Docket #1 ¶¶ 23, 26, 31). Thus, even though the Medical College had not yet paid for the licenses in question, the Medical College's purported obligation to do so sprung directly from the pre-existing obligations it owed to Attachmate.

### 1.4    Conclusion

In looking at the "peculiar facts and circumstances" of this case, the Court concludes that the Medical College was not a member of "the public" for the purpose of its WDTPA claim. *K & S Tool & Die Corp.*, 301 Wis.2d 109, ¶ 24. The Medical College and Attachmate have been parties to at least 764 licensing agreements for approximately 14 years. *See also Uniek, Inc.*, 474 F. Supp. 2d at 1040; (Docket #1 ¶ 14). The "overall nature" of their agreement is that of contracting parties; and as contracting parties, the Medical College's and Attachmate's obligations are defined by the licenses associated with Reflection software. *See Blanchar*, 2009 WI App 21, ¶ 15; (Docket #1 ¶¶ 12, 14,

26). Ultimately, the representations in this case center on how the Medical College has deployed Attachmate's software and whether that manner of deployment complies with the parties' licensing agreements. (Docket #1 ¶¶ 12-24, 64). Under this arrangement, the Medical College is not a member of "the public," and the Court will accordingly grant Attachmate's motion to dismiss the Medical College's WDTPA claim. (Docket #28).[8]

## 2. MOTIONS FOR SUMMARY JUDGMENT

The Court must next address the parties' motions for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Docket #41, #46). On the one hand, Attachmate moves the Court to grant partial summary judgment in its favor with respect to liability on its breach of contract claim against the Medical College.[9] (Docket #41). In addition, Attachmate argues that it is entitled to judgment as a matter of law with respect to the Medical College's claim for a violation of the implied covenant of good faith and fair dealing. (Docket #41). On the other hand, the Medical College asks the Court to grant summary judgment in its favor with respect to: (1) its claim for breach of the implied covenant of good faith and fair dealing; (2) Attachmate's breach of contract claim; and (3) Attachmate's copyright infringement claim. (Docket #46). For the reasons described below, the Court will grant Attachmate's motion insofar as it relates to liability for a breach of

---

[8]In light of this ruling, the Court need not address the parties' summary judgment arguments with respect to the WDTPA claim.

[9]Attachmate states, in its opposition to the Medical College's motion for summary judgment, that it is likewise entitled to judgment as a matter of law with respect to its copyright claim. (Docket #60 at 2). However, as Attachmate has not moved for summary judgment on this claim, the Court will not grant Attachmate's request pursuant to Rule 56(c). *See* FED. R. CIV. P. 56(c) (requiring advance notice to rule on summary judgment sua sponte).

Section 1 of the parties' software contract; but, the Court will deny Attachmate's motion insofar as it relates to liability for a breach of Section 4 of the parties' software contract. (Docket #41). In addition, the Court will deny the Medical College's motion in its entirety. (Docket #46). For the sake of clarity, the Court will set forth the relevant facts that are applicable to the parties' claims and then address the parties' arguments on a claim-by-claim basis.

### 2.1    Material Facts[10]

The Medical College is a Wisconsin not-for-profit corporation with its principal place of business in Milwaukee, Wisconsin.[11] (Docket #90, Ex. 2 ¶ 1). It focuses on providing world-class clinical care, education, and research in Wisconsin. (Docket #90, Ex. 2 ¶ 1).

---

[10]Unless otherwise stated, the facts in this section will be taken from the parties' proposed findings of fact (Docket #40, #90, Ex. 2, #61, #111, Ex. 3) and/or responses thereto (Docket #61, #111, Ex. 2, #102 Ex. 2, #75). Any disputes relative to these facts will be noted. To be clear, the facts in this section will be devoted to those *material facts* that are relevant to the decision herein. *Cf.* Civ. Local R. 56(b)(1)(C). This bears special mention because a substantial number of the Medical College's proposed facts embody *legal arguments* that are ill-disguised as "facts." (*See e.g.*, Docket #90, Ex. 2 ¶¶ 36, 61, 80, 96-100, 104-105, 113-114, 118, 120-126). For example, nearly the whole of the Medical College's introduction to its analysis was grafted into its proposed findings of fact. (*Compare* Docket #90, Ex. 1 at 13-14 *with* Docket #90, Ex. 2 ¶¶ 96-100). Despite the Court's frustration in this regard, it must nonetheless sift and winnow its way through the parties' filings in order to present those *facts* which are both *relevant and material* to the issues presented. However, for this reason, the Court will rely primarily on Attachmate's proposed findings of fact for the purpose of this section.

[11]To the extent possible, the Court will attempt to avoid repeating the facts outlined above. However, because there is a larger body of fact applicable to the parties' summary judgment motions, some overlap may necessarily occur.

Attachmate is a Washington corporation with its principal place of business in Seattle, Washington. (Docket #40 ¶ 4). In 2005, the company merged with another Seattle-based software company called WRQ, Inc. (Docket #1 ¶ 5). Attachmate was the surviving entity. (Docket #40 ¶ 5).

Within the software industry, Attachmate creates and licenses terminal emulation products. (Docket #40 ¶ 6). As described above *(see supra*, Part 1.1.1), terminal emulation software allows Windows-based devices to connect to non-Windows-based operating systems. (Docket #1 ¶ 13).

One of the terminal emulation product lines originally developed by WRQ, Inc., and continued by Attachmate after the 2005 merger, is called Reflection. (Docket #40 ¶ 6). Within the Reflection software line, Attachmate owns a number of different products, including, but not limited to: (1) Reflection X; (2) Reflection for UNIX and Open VMS;[12] (3) Reflection for IBM; and (4) Reflection for HP. (Docket #40 ¶ 7). Each of these products also has particular versions associated with it. (Docket #40 ¶ 8). Attachmate owns copyrights with respect to each of these Reflection product lines. (Docket #61 ¶¶ 137-145).

Since at least 1997, the Medical College has purchased licenses for certain Reflection software products from Attachmate's predecessor, WRQ, Inc. (Docket #40 ¶ 9). Though the Medical College does not have precise information concerning the software that it purchased and installed between

_____

[12]In certain places, the parties refer to this software program as "Reflection for UNIX and OpenVMS 10," and in other places they refer to this program merely as "Reflection for OpenVMS 10." (*See* Docket #102, Ex. 2 ¶¶ 16-23). Neither of the parties argue that there is a difference between these two products. For consistency, the Court will reference this program by what appears to be its complete name: Reflection for UNIX and OpenVMS 10.

1997 and 2003,[13] the products at issue in this case correspond to the Reflection Version 10 product line, which was created in 2002. (Docket #90, Ex. 2 ¶ 63; Docket #61 ¶¶ 138, 140, 142, 144).

The Medical College claims to rely on Reflection software, specifically the Reflection for UNIX and OpenVMS 10 program, for its billing and collections work.[14] (Docket #90, Ex. 2 ¶¶ 17, 21). At all times relevant to this lawsuit, the Medical College had owned at least: (1) 620 licenses for Reflection for UNIX and OpenVMS 10; and (2) 7 licenses for Reflection X 10.[15] (Docket #40 ¶¶ 10-11). In addition, the Medical College purchased 14 licenses for Reflection for UNIX and OpenVMS 2014, version R1, in 2013 and 2014.

---

[13]This lack of information is due to the passage of time along with various organizational changes made to the Medical College's information services department. (Docket #90, Ex. 2 ¶¶ 64-69).

[14]Attachmate disputes the fact that the Medical College only "uses" Reflection for UNIX and OpenVMS 10. (Docket #61 ¶ 21). Specifically, Attachmate argues that the Medical College is also "using" Reflection X 10 because the Medical College has also "installed" Reflection X 10. (Docket #61 ¶ 21). Attachmate's objection reflects a broader dispute about: (1) the proper interpretation of the EULA; and (2) whether Reflection for UNIX and OpenVMS 10 is, in fact, a *component of* Reflection X 10. (See Docket #102, Ex. 2 ¶¶ 36, 53, 87). These issues will be discussed in more detail below. (*See infra*, Part 2.3.1.2).

[15]The Medical College provides different amounts of the total number of licenses purchased. In certain places, the Medical College states that, in total, it purchased 764 licenses from WRQ, Inc., prior to Attachmate's merger. (Docket #90, Ex. 2 ¶ 16). Elsewhere, the Medical College states that it only owns 620 licenses for Reflection for UNIX and Open VMS 10 and 7 licenses for Reflection X 10. (Docket #90, Ex. 2 ¶ 16). Neither of the parties explain the difference between these figures.

(Docket #90, Ex. 2 ¶ 22). The Medical College does not own any licenses for Reflection for IBM or Reflection for HP.[16] (Docket #40 ¶¶ 12-13).

The EULA associated with the Reflection line of software is at the heart of this dispute. Attachmate claims that each of the software products owned by the Medical College operates under a standard license agreement that applies to all version 10.0 Reflection products, including Reflection X 10, Reflection for UNIX and OpenVMS 10, Reflection for IBM 10, and Reflection for HP 10.[17] (Docket #40 ¶ 14). Attachmate further claims that the Medical College accepted the terms of the Reflection 10 EULA when it installed the Reflection products on Medical College's computers and servers. (Docket #40 ¶ 15; *see also* Docket #60 at 10 n.8) (describing the click-wrap contract). As will be discussed further below (*see infra*, Part 2.3.1.2), the Medical College claims that "Attachmate has provided no evidence that [it] accepted the terms of the Reflection 10 [EULA]." (Docket #111, Ex. 2 ¶¶ 15, 18-21). The EULA states:

---

[16]The Court notes that the parties' proposed findings of fact reveal that they have a number of disagreements as to the price point of Reflection software programs. (*See e.g.*, Docket #61 ¶¶ 18-20). However, as pricing information is relevant only with respect to damages, the Court need not delve into the large body of disputed facts on this topic.

[17]The Medical College's response to this fact states that the EULA fails to "explicitly state to which products or versions it applies within the Reflection line of products." (Docket #111, Ex. 2 ¶ 14). However, the EULA is clearly titled "WRQ Reflection," which supports Attachmate's position that the EULA was a standard contract that applied to all Reflection products. (Docket #111, Ex. 2 ¶ 14). Putting this dispute aside, the Medical College does not argue that the EULA is rendered invalid by its failure to designate the specific versions to which it applies, and thus the Court will not address this issue further.

1. GRANT OF LICENSE. This EULA grants you the following rights:

*You may install, use, access, display, run, or otherwise interact with ("Run") one copy of the Software on a single computer or workstation ("Computer").* You may also store or install a copy of the Software on a storage device, such as a network server(s), used only to allow your other Computers to Run the Software over an internal network. *You must acquire and dedicate a license for each Computer on which the Software is Run.* The primary user of the Computer on which the Software Runs may make a second copy for his or her exclusive use on a home or portable Computer. If you deploy WRQ Software to an end user by establishing a Roaming User Profile setting in Windows NT or Windows 2000, you must acquire and dedicate a license for each end user who will access the WRQ Software under a Roaming User Profile ("Roaming User"). A Roaming User who is licensed to use the Software may install and use the Software on multiple desktops, so long as the Roaming User uses only one copy of the Software at one time. You must ensure that copies of the Software for use by Roaming Users on desktops outside your control are destroyed when a Roaming User's right to use the Software is terminated.

…

4. SAFEGUARDS/AUDIT RIGHTS. *You agree to*

*(i) implement internal safeguards to prevent any unauthorized copying, distribution, or use of the Software;*

(ii) provide WRQ with written certification of the number of copies or concurrent usage of the Software on request, and

(iii) to allow WRQ to audit your premises and systems for compliance with this EULA during regular business hours. WRQ will pay for the cost of the audit unless the audit shows a discrepancy which is five percent (5%) or more of the number of copies of the Software Run over the licenses you have acquired; in which event, you shall pay for the cost of the audit.

(Docket #90, Ex. 2 ¶ 102). The Reflection 10 EULA is governed by Washington law. (Docket #40 ¶ 16).

In October of 2014, Attachmate demanded an audit to determine whether the Medical College was complying with the Reflection licenses that it owned.[18] (Docket #40 ¶ 37; Docket #90, Ex. 2 ¶ 27). The Medical College cooperated with that request, and ran Attachmate's computer queries to gather data regarding which computers and servers had Reflection software installed.[19] (Docket #40 ¶ 37; Docket #90, Ex. 2 ¶¶ 28, 30). The results of that audit triggered the negotiations that eventually led to this law suit.

Using the audit data,[20] Attachmate prepared a report summarizing its findings. (Docket #90, Ex. 2 ¶ 33). The report showed that the Medical College had installed Reflection X 10 on over 1,250 personal computers. (Docket #111, Ex. 2 ¶ 39). In total, the audit report stated that Reflection X 10

---

[18]The Medical College speculates that this audit came in response to failed negotiation between the parties. (Docket #90, Ex. 1 at 5; Docket #90, Ex. 2 ¶¶ 22-26). However, the motive for the audit is irrelevant to the arguments and issues presented.

[19]The Medical College proposes many facts dedicated to explaining the nature of these "queries," which it calls "scripts." (Docket #61 ¶ 29-32). This discussion is irrelevant to this Court's breach of contract decision.

[20]The Medical College disputes the results contained in Attachmate's audit by arguing that the audit was unreliable and presumed a certain interpretation of the EULA, which is flawed. (Docket #111, Ex. 2 ¶ 39, Docket #90, Ex. 2 ¶¶ 38-40, 87). These issues will be discussed in further detail below, at least insofar as they pertain to contract liability. (*See infra*, Part 2.3.1.2). The Court notes that immediately after the audit, and continuing today, Attachmate admitted that its results may embody some inaccuracies. (Docket #61 ¶ 41). However, the Medical College has not provided the information that Attachmate would need to determine whether any double-counting of software had occurred. (Docket #111, Ex. 2 ¶ 47). Thus, whether, and to what extent, this double-counting issue will affect Attachmate's recovery is ultimately a question related to damages.

was over-deployed 2,498 times. (Docket #90, Ex. 2 ¶ 89). Besides Reflection X 10, Attachmate also claimed to have found one copy of Reflection for IBM 10 and one copy of Reflection of HP 10 installed on the Medical College's computers. (Docket #111, Ex. 2 ¶¶ 41-42).

When Attachmate sent the audit report to the Medical College on December 3, 2014, it stated that the alleged "non-compliance" issue needed to be resolved within 30 days. (Docket #90, Ex. 2 ¶ 41). Attachmate also stated that, in order to come into compliance with the Reflection EULA, the Medical College owed $2,604,495.04, which comprised both a licensing fee and a 12% interest charge. (Docket #90, Ex. 2 ¶ 42).

Upon receiving this information, the Medical College was "shocked" because it was operating under the assumption that it did not use Reflection X 10 software. (Docket #90, Ex. 2 ¶¶ 44, 53). Rather, the Medical College thought that the only program that its staff was using was Reflection for UNIX and OpenVMS 10.[21] (Docket #90, Ex. 2 ¶ 44). This is because Reflection for UNIX and OpenVMS 10 was the terminal emulation software that—according to the Medical College's understanding—allowed certain employees to access and operate a specific billing and collections program, known as GE/IDX.[22] (Docket #90, Ex. 2 ¶¶ 49, 56-57). In total, the number of people who *actually used* GE/IDX, and thus Reflection for UNIX and

---

[21]The Medical College admits that it has been confused at various times during this litigation as to which software that it has "used" and/or "installed." (Docket #102, Ex. 2 ¶¶ 36, 79, 126).

[22]GE/IDX is a non-Windows-based program that cannot operate without a terminal emulation software like Reflection for UNIX and OpenVMS 10. (Docket #90, Ex. 2 ¶¶ 51, 58).

OpenVMS 10, was purportedly limited to 620 credentialed employees in the billing and collection department.[23] (Docket #90, Ex. 2 ¶¶ 50, 59).

In light of this information, the Medical College conducted an internal inquiry into its deployment of Reflection software. (Docket #111, Ex. 2 ¶ 43). That investigation also revealed that Reflection X 10 (or, according to the Medical College, Reflection for UNIX and OpenVMS 10) had been installed on over 1,280 personal computers. (Docket #111, Ex. 2 ¶ 44). Though the Medical College confirmed that it found one copy of the Reflection for IBM 10 and one copy of Reflection for HP 10 installed on its computers, it was unable to determine how that software was obtained. (Docket #111, Ex. 3 ¶ 21).

Although the Medical College had changed the way in which it manages its technology services many times since 1997 (Docket #90, Ex. 2 ¶¶ 63-69), its internal investigation eventually recovered the installation file to the Reflection software (Docket #90, Ex. 2 ¶ 70). Based on the configuration of that installation file, the parties actively dispute how to characterize the software in dispute.

According to the Medical College, the Reflection installation file, which is titled "Reflection X," purportedly includes both Reflection X 10 *and* Reflection for UNIX and OpenVMS 10. (Docket #90, Ex. 2 ¶ 70). Moreover, the installation kit apparently defaults to installing both programs, which is described as a "complete" installation. (Docket #90, Ex. 2 ¶ 71; Docket #61 ¶ 71). The Medical College argues that, because the Reflection software was

---

[23]Attachmate argues that the number of GE/IDX users could have reached as high as 1,792 when the Medical College outsourced its technology management to a third-party vendor, known formerly as Tushaus Computer Services, LLC. (Docket #61 ¶ 59).

not clearly identified and/or did not require a license key for installation, Reflection X 10 and/or Reflection for UNIX and OpenVMS 10 might have been inadvertently installed together. (Docket #61 ¶ 81).[24]

For its part, Attachmate maintains that, even though Reflection X 10 and Reflection for UNIX and OpenVMS 10 are distinct products, Reflection for UNIX and OpenVMS 10 is properly understood as a *component of* Reflection X 10. (Docket #61 ¶ 88; Docket #102, Ex. 2 ¶¶ 21, 36, 53, 59, 72). This is because Reflection X 10 allegedly contains three components: (1) Windows X Server; (2) Reflection for UNIX and OpenVSM 10; and (3) FTP Client. (Docket #61 ¶ 76). Thus, according to Attachmate, whether or not the Medical College installed the "complete" Reflection X 10 product and/or just the component—Reflection for UNIX and OpenVMS 10—is immaterial because each and every installation is a Reflection X 10 installation. (Docket #102, Ex. 2 ¶¶ 21, 53, 59, 72). Thus, the parties dispute whether Reflection for UNIX and OpenVMS 10 can and/or should be understood as a component of Reflection X 10. (*See* Docket #102, Ex. 2 ¶¶ 21, 36, 53, 72, 87-88, 126).

In January of 2015, Attachmate contacted the Medical College to discuss the Reflection audit. (Docket #111, Ex. 2 ¶ 50). The Medical College claims that, during the ensuing discussions, Attachmate was non-cooperative, failed to provide requested information, and discouraged the Medical College from continuing to investigate the matter.[25] (Docket #90,

---

[24]The installation program for Reflection X 10 allows the individual installing the software to choose one of three options: (1) a typical installation which installs the most common application features; (2) a custom installation in which the individual selects what features to install; and (3) a complete installation in which all application features are installed. (Docket #61 ¶ 74).

[25]Attachmate disputes these facts. (Docket #102, Ex. 2 ¶¶ 45, 93).

Ex. 2 ¶¶ 45, 93-94). In addition, the Medical College argues that it has since determined that Attachmate's audit, report, and subsequent negotiations were wrongful because they: (1) misrepresented the Medical College's use of Reflection software; (2) were based on inflated and/or untrue license prices; and (3) were purposefully conducted with a false sense of urgency in order to extract a lucrative settlement,[26] all of which Attachmate denies. (Docket #81 ¶¶ 41-55). On February 5, 2015, the Medical College filed this suit. (Docket #40 ¶ 52).

### 2.2    Legal Standard

When a party files a motion for summary judgment, it is their "contention that the material facts are undisputed and the movant is entitled to judgment as a matter of law." *Hotel 71 Mezz Lender LLC v. Nat. Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015) (citing Fed. R. Civ. P. 56(a)). "Material facts" are those facts which "might affect the outcome of the suit," and "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, to have a genuine dispute about a material fact, a party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 474 U.S. 574, 586 (1986); namely, the party in opposition

---

[26]The Medical College proffers a number of proposed facts dedicated to Attachmate's business model. (Docket #90, Ex. 2 ¶¶ 13-15; 42). Without commenting on the propriety of Attachmate's profit model and employee compensation methods, the Court finds any discussion of these facts irrelevant to the issues presented.

"must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

"Where…the movant is seeking summary judgment on a claim as to which it bears the burden of proof, it must lay out the elements of the claim, cite the facts it believes satisfies these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claims." *Hotel 71 Mezz*, 778 F.3d at 601. In analyzing whether summary judgment should be granted, a court must draw all reasonable inferences from the materials before it in favor of the non-moving party. *Id.* When a court denies a motion for summary judgment, it "reflects the court's judgment that one or more material facts are disputed or that the facts relied on by the motion do not entitle the movant to judgment as a matter of law." *Id.* at 602.

### 2.3    Analysis

Both parties have filed summary judgment motions. (Docket #41, 46). On the one hand, the Medical College asks this Court to enter summary judgment in its favor with respect to: (1) Attachmate's breach of contract claim; (2) Attachmate's copyright infringement claim; and (3) its own claim that Attachmate breached the implied covenant of good faith and fair dealing. (Docket #46). On the other hand, Attachmate asks this Court to enter partial summary judgment in its favor with respect to: (1) liability for its breach of contract claim; and (2) the Medical College's claim for breach of the implied covenant of good faith and fair dealing. (Docket #41). The Court will address the parties' arguments on a claim-by-claim basis.

Case 2:15-cv-00151-JPS    Filed 02/19/16    Page 26 of 45    Document 113

### 2.3.1  Breach of Contract

The crux of this case is Attachmate's breach of contract claim. The Court will begin by addressing this claim first.

#### 2.3.1.1  Washington Contract Law

The parties do not dispute that Washington contract law governs. (Docket #111, Ex. 2 ¶ 16). Under Washington law, "[t]he elements of a breach of contract claim are: (1) the existence of a valid contract, (2) breach of that contract, and (3) damages resulting from the breach." *Karpenski v. Am. Gen. Life Companies, LLC*, 999 F. Supp. 2d 1235, 1250 (W.D. Wash. 2014). "When interpreting a contract, [a court's] primary objective is to discern the parties' intent." *Wm. Dickson Co. v. Pierce Cty.*, 128 Wash. App. 488, 493, 116 P.3d 409, 412 (2005). "Unilateral or subjective purposes and intentions about the meanings of what is written do not constitute evidence of the parties' intentions." *Lynott v. Nat'l Union Fire Ins. Co.*, 123 Wash.2d 678, 684, 871 P.2d 146 (1994). Courts are to give undefined contract terms their "'plain, ordinary, and popular'" meaning. *Kitsap County v. Allstate Ins. Co.*, 136 Wash.2d 567, 576, 964 P.2d 1173 (1998) (quoting *Boeing Co. v. Aetna Cas. & Sur. Co.*, 113 Wash. 2d 869, 877, 784 P.2d 507 (1990)). "Whether a contract is ambiguous and the legal effect of a contract are, in general, questions of law." *Brown v. Hereford*, 163 Wash. App. 1015, 2011 WL 3688969, *3 (2011). Ambiguity exists in a contract where two or more reasonable interpretations are possible. *Wm. Dickson Co.*, 128 Wash. App. at 493. "But a contract is not ambiguous simply because the parties suggest opposing meanings." *Id.*

### 2.3.1.2 Breach of Contract Analysis[27]

Attachmate argues that the Medical College has breached the Reflection 10 EULA[28]—which governs the Reflection X 10, Reflection for UNIX and OpenVMS 10, Reflection for IBM 10, and Reflection for HP 10 programs—in two respects. (Docket #42 at 9-11). First, Attachmate claims that the Medical College breached the EULA by installing certain Reflection programs contrary to that which is allegedly permitted by Section 1 of the agreement. (Docket #42 at 9-11). Second, Attachmate argues that the Medical College failed to "implement internal safeguards to prevent unauthorized copying, distribution, or use" of Reflection X 10, which is purportedly required by Section 4 of the EULA (Docket #42 at 9-11).

---

[27]The parties do not dispute the validity of the EULA. Moreover, in light of the large number of disputed facts regarding damages, the Court's analysis will focus exclusively on the question of breach.

[28]The Court will hereinafter reference the Reflection 10 EULA as "the EULA" or "Reflection 10 EULA" interchangeably.

The Medical College rejects Attachmate's arguments.[29] (*See generally* Docket #90, Ex. 1). First, the Medical College argues that regardless of how many times it may have *installed* Reflection software, the Medical College's actions did not breach the Reflection 10 EULA because the contract creates only a *user*-based obligation. (*See* Docket #90, Ex. 1 at 13-21) ("Section 1 of the EULA instructs the licensee to determine how many licenses will be needed based upon how the 'users' will *actually use* the software.") (emphasis added). Under this theory, the Medical College argues that it does not breach the EULA because its use of Reflection is in line with the amount of Reflection licenses that it owns. (Docket #90, Ex. 1 at 17-20). Second, the Medical College argues that its GE/IDX safeguards prevented unauthorized copying, distribution, or use of Reflection software. (Docket #90, Ex. 1 at 17-18).

---

[29]The Medical College argues (by implication) in its responses to Attachmate's proposed findings of fact that it might not have *accepted* the terms of the EULA. (*See* Docket #111, Ex. 2 ¶ 15) ("Attachmate has produced no evidence that the College accepted the terms of the Reflection 10 SLA…."). The Court will not address this issue for two reasons. First, the Medical College's briefs do not argue that the contract claim fails on the basis of the Medical College's purported failure to accept the contract. Any argument not raised in the Medical College's brief is waived. *See Havoco of Am., Ltd. v. Sumitomo Corp. of Am.*, 971 F.2d 1332, 1336 (7th Cir. 1992). Second, Attachmate represents that the Reflection 10 EULA is a "click through" agreement, *i.e.*, the licensee must click through and accept its terms before installation. (Docket #60 at 10 n.8); *see also Specht v. Netscape Comms. Corp.*, 306 F.3d 17, 22 (2d Cir. 2002) (explaining that a click-wrap agreement "presents the user with a message on his or her computer screen, requiring that the user manifest his or her assent to the terms of the…agreement by clicking on an icon. The product cannot be obtained or used unless and until the icon is clicked."). And, click-through agreements are valid forms of contracting. *See, e.g., F.T.C. v. Cleverlink Trading Ltd.*, No. 05-CV-2889, 2006 WL 3106448, at *6 (N.D. Ill. Oct. 26, 2006) ("The fact that the acceptance may have come electronically in the form of a click in a box is analytically meaningless, as all the cases have held.") (citing *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 403 (2nd Cir. 2004)).

The Court agrees that the Medical College is liable to Attachmate under Section 1 of the EULA based on the number of Reflection installations that the Medical College found on its computers. The Court will, accordingly, grant Attachmate's motion for partial summary judgment with respect to this theory of breach. However, because a dispute of fact exists with respect to whether the Medical College implemented sufficient internal safeguards under Section 4 of the EULA, that theory of breach must proceed to trial.

The Reflection 10 EULA imposes various obligations on licensees. First, Section 1 prescribes the scope of permissible conduct under the license. (Docket #90, Ex. 2 ¶ 102). This Section begins by broadly defining the term "run." (Docket #90, Ex. 2 ¶ 102). Specifically, the agreement states that, "[t]his EULA grants you the following rights: You may install, use, access, display, run, *or* otherwise interact with ('Run') one copy of the Software on a single computer or workstation ('Computer')." (Docket #90, Ex. 2 ¶ 102) (emphasis added). Further, the EULA provides that a licensee "may store or install a copy of the Software on a storage device, such as a network server(s), used only to allow your other Computers to Run the Software over an internal network." (Docket #90, Ex. 2 ¶ 102). However, in any case, the licensee "*must acquire and dedicate a license* for each Computer on which the Software is Run," where "run" is defined to mean "install, use, access, display, run, *or* otherwise interact with" the Software. (Docket #90, Ex. 2 ¶ 102) (emphasis added).

Thus, putting the EULA's language together, it is clear that a licensee must purchase a license for each "Computer" in which the Reflection software is either installed, used, accessed, displayed, run, *or* otherwise interacted with by the licensee. (Docket #90, Ex. 2 ¶ 102). This meaning

Case 2:15-cv-00151-JPS   Filed 02/19/16   Page 30 of 45   Document 113

comports with the plain and ordinary terms of the contract, particularly in light of the disjunctive "or" employed within the definition of "run." *See* CONJUNCTIVE/DISJUNCTIVE CANON, BLACK'S LAW DICTIONARY (10th ed. 2014) ("[O]r joins a disjunctive list to create alternatives."); *see also Kitsap County*, 136 Wash.2d at 576 (explaining that ordinary terms must be given their plain meaning).

With this interpretation in mind, the Court concludes that the Medical College has breached Section 1 of the Reflection EULA. This conclusion is based on the simple comparison of how many licenses the Medical College has purchased with the number of times the Medical College has "run" the Reflection software, as that term is defined in the EULA. On the one hand, the Medical College owns: (1) 620 licenses for Reflection for UNIX and OpenVMS 10; (2) 7 licenses for Refection X 10; (3) no licenses for Reflection for HP 10; and (4) no licenses for Reflection for IBM 10. (Docket #111, Ex. 2 ¶¶ 10-13). On the other hand, Attachmate's audit revealed that: (1) Reflection X 10 was over-deployed 2,498 times on the Medical College's computers; (2) Reflection for IBM 10 was installed on one computer; and (3) Reflection for HP 10 was installed on one computer. (Docket #111, Ex. 2 ¶¶ 39-42). Though the Medical College disputes the validity of the audit, the Medical College's own investigation found at least 1,280 installations of Reflection for UNIX and OpenVMS 10 or Reflection X 10, depending on the characterizations of those products. (Docket #111, Ex. 2 ¶ 44). Thus, the Medical College undisputedly "ran" Reflection software, of at least three varieties, in excess of that for which they owned valid licenses.

As referenced above, the parties actively dispute how to characterize Reflection X 10, *i.e.*, whether or not Reflection for UNIX and OpenVMS 10 is a *component* of Reflection X 10 or a stand alone product. (*See supra*, Part 2.1). That dispute, however, is irrelevant to the Court's breach analysis. On the one hand, if, as the Medical College proposes, these programs are distinct products, the Medical College is required to "acquire and dedicate" a license for: (1) each installation of Reflection for UNIX and OpenVMS 10; (2) each installation of Reflection X 10; and (3) each "Computer" that uses, accesses, displays, or runs Reflection for UNIX and OpenVMS 10 and/or Reflection X 10. (*See* Docket #90, Ex. 2 ¶ 102). On the other hand, if Reflection for UNIX and OpenVMS 10 is a *component* of a Reflection X 10, then the 620 licenses that the Medical College already owns for that product *may* be used to offset the number of deficient licenses.[30] In either case, however, the Medical

_____

[30]To be clear, the Court expresses no opinion as to whose investigation, Attachmate's or the Medical College's, is correct with respect to the total number of installations of Reflection X 10 and/or Reflection for UNIX and OpenVMS 10.

Case 2:15-cv-00151-JPS   Filed 02/19/16   Page 32 of 45   Document 113

College has undisputedly installed at least 660 Reflection programs for which they have no license.[31]

The Medical College, in a futile search for ambiguity, argues that it "operate[s] within the spirit and the letter" of the parties' agreement because the EULA creates a user-based obligation. (Docket #90, Ex. 1 at 2, 17-20). In other words, the Medical College argues that Attachmate "is trying to re-write the" EULA by failing to account for how the Medical College actually uses Reflection software. (Docket #90, Ex. 1 at 1, 13-14, 17-20) (arguing that the Medical College did not breach the EULA "because it: (1) *purchased a license for each user* who used Reflection for [UNIX] and OpenVSM v. 10 to access and use GE/IDX; [and] (2) *did not use* Reflection X v. 10") (emphasis added).

The Medical College's user-based interpretation is unreasonable and flawed for two reasons. First, the argument defies a plain and natural reading of the EULA's text, which ties the obligation of "acquir[ing] and dedicat[ing]"

---

[31]The Court derives this figure from the following equation:

$$1,280 - 620 - 7 = 658 + 2 = 660.$$

The 1,280 figure represents the minimum number of Reflection X 10 and/or Reflection for UNIX and OpenVMS 10 installations found by the Medical College. (Docket #111, Ex. 2 ¶ 44. The 620 figure represents the number of licenses that the Medical College owns for Reflection for UNIX and OpenVMS 10. (Docket #111, Ex. 2 ¶ 10). And, the 7 figure represents the number of licenses that the Medical College owns for Reflection X 10. (Docket #111, Ex. 2 ¶ 11). The final addition of 2 corresponds to the Reflection for HP 10 and Reflection for IBM 10 installations. (Docket #111, Ex. 2 ¶¶ 41-42). The Court's calculation assumes, in a light most favorable to the Medical College, that all of the Medical College's Reflection X 10 licenses *and* its Reflection for UNIX and OpenVMS 10 licenses may be used to offset its license shortfall, which is, of course a determination that will be made at trial. However, this calculation underscores the Court's conclusion that—under the Court's interpretation of the EULA—the undisputed facts show that the Medical College is "running" more Reflection software than that which it is has license to.

licenses to how the licensee "runs" the software. (Docket #90, Ex. 2 ¶ 102) (defining "run" expansively to include installation). Second, the Medical College's interpretation over-reads the language in the EULA's "roaming user" provision without having shown that its employees meet the requirements of that type of "user."[32] (Docket #90, Ex. 1 at 18; *see also* Docket #90, Ex. 2 ¶ 102) (explaining that the "roaming user" provision only applies to those users who "establish[] a Roaming User Profile setting in Windows NT or Windows 2000.") The Medical College presents no evidence to show that it has established roaming user profiles so as to justify its license shortfall provision.[33]

---

[32]The "roaming user" provision of Section 1 provides:

> *If you deploy* WRQ Software to an end user *by establishing a Roaming User Profile setting in Windows NT or Windows 2000*, you must acquire and dedicate a license for each end user who will access the WRQ Software under a Roaming User Profile ("Roaming User"). A Roaming User who is licensed to use the Software may install and use the Software on multiple desktops, so long as the Roaming User uses only one copy of the Software at one time. You must ensure that copies of the Software for use by Roaming Users on desktops outside your control are destroyed when a Roaming User's right to use the Software is terminated.

(Docket #90, Ex. 2 ¶ 102) (emphasis added).

[33]The Medical College also presents no argument that the "primary user" provision in the EULA is somehow applicable to its breach. (*See* Docket #90, Ex. 2 ¶ 102) ("The primary user of the Computer on which the Software Runs may make a second copy *for his or her exclusive use on a home or portable Computer*.") (emphasis added).

The Medical College's argument that it did not "use" Reflection X 10 because that program is allegedly incompatible with the GE/IDX billing software is also rendered irrelevant by the Court's interpretation of the EULA. That the Medical College does not "use" the software in question is of no moment because the EULA obligates the Medical College to "acquire and dedicate" a license for, among other things, each installation of Reflection, regardless of whether the Medical College "uses" the software or not. The Court simply cannot rewrite an unambiguous contract to accommodate the Medical College's "use" of Reflection. *Cf. Lynott v. Nat'l Union Fire Ins. Co.*, 123 Wash.2d at 684 (reasoning that "[u]nilateral or subjective purposes and intentions" do not govern interpretation of an unambiguous contract).

The Medical College's final attack on Attachmate's breach of contract claim is directed towards Attachmate's entitlement to damages. (Docket #90, Ex. 1 at 22-25). Under the Medical College's theory, Attachmate cannot recover because: (1) the only remedy for the breach of the EULA is termination; (2) Attachmate cannot prove actual damages because it "does not track sales of Reflection software by product or version"; and (3) the Medical College would not have entered into the agreement had it been apprised of its need to purchase a license for each installation of the software. (Docket #90, Ex. 1 at 22-24).

These arguments are unavailing. Though, as the Medical College contends, "[c]ontract damages are ordinarily based on the injured party's expectation interest and are intended to give the injured party the benefit of its bargain," *Panorama Vill. Homeowners Ass'n v. Golden Rule Roofing, Inc.*, 102 Wash. App. 422, 427, 10 P.3d 417, 421 (2000), the undisputed facts

Case 2:15-cv-00151-JPS   Filed 02/19/16   Page 35 of 45   Document 113

demonstrate that the Medical College has not complied with its license obligations. Thus, Attachmate is entitled to the lost license fees that it suffered as a natural result of that breach. *See Educ. Logistics, Inc. v. Laidlaw Transit, Inc.*, 583 F. Appx. 624, 625 (9th Cir. 2014) (finding that the plaintiff was entitled to lost license fees as actual damages under license agreement), *cert. denied*, 135 S. Ct. 1493 (2015). Moreover, although the parties dispute the propriety of Attachmate's license prices for the products in question, it will be for the jury to determine whether these purported fees are reasonable and appropriate given the facts of this case. (*Cf.* Docket #61 ¶ 117-118; Docket #102, Ex. 1 ¶ 44. Finally, the Medical College's one-sentence reference to the RESTATEMENT (SECOND) OF CONTRACTS § 211(3) is unpersuasive and unsupported. (Docket #90, Ex. 1 at 24 n.11). The Medical College has put forth no evidence to suggest why Attachmate would have had reason to doubt the Medical College's assent to its license terms. Even if there are free or low cost alternatives to Attachmate's terminal emulation software, the Medical College fails to explain why, in light of that fact, it continued to purchase Attachmate's software in 2014. The Court simply has no basis from which to infer that Attachmate and the Medical College, two sophisticated entities, had anything but their eyes wide open when entering into their license agreements.

Secondly, Attachmate also argues that the Medical College breached Section 4 of the Reflection 10 EULA by failing to "implement internal safeguards to prevent any unauthorized copying, distribution, or use of" Reflection software. (Docket #42 at 9). The Medical College responds that it did implement internal safeguards for Reflection 10 by virtue of the fact that: (1) GE/IDX was not compatible with Reflection X; (2) only credentialed

GE/IDX users could use Reflection for UNIX and OpenVMS 10; and (3) the location and administrator rights protecting the Reflection installation file were sufficient to prevent against unauthorized copying, distribution, or use of the software. (Docket #90, Ex. 1 at 20-21; Docket #111, Ex. 1 at 24-25).

The Medical College's first two arguments are unpersuasive and, unsurprisingly, focused on "use" rather than "copying and distribution," which are equally the subject of Section 4 of the EULA. First, the Medical College fails to explain how the purported inability of GE/IDX to work with Reflection X 10 affects its responsibility to prevent unauthorized "copying or distribution" of the software. Likewise, the fact that Medical College employees had credentials to operate GE/IDX does not act to prevent "copying or distribution" of the Reflection software, which Section 4 is designed to protect.

However, the fact that the Medical College: (1) stored the Reflection installation file in a location of which most people were unaware; and (2) prevented unfettered installation of the programs by certain "administrator rights," does create a dispute of fact. (Docket #111, Ex. 1 at 25). Based on this information, the Court simply cannot determine the extent to which employees could "install" the Reflection program onto employees' computers. (Docket #111, Ex. 2 ¶ 29). Moreover, the Court remains unclear

Case 2:15-cv-00151-JPS   Filed 02/19/16   Page 37 of 45   Document 113

how these administrator rights specifically affected "copying, distribution, or use." This issue must, therefore, be resolved at trial.[34]

### 2.3.1.3  Conclusion

In sum, the Court concludes that, pursuant to Section 1 of the EULA, the Medical College was required to "acquire and dedicate a license for each Computer on which the [Reflection] Software [ha]s [been] Run," where "run" means to "install, use, access, display, run, or otherwise interact with…one copy of the Software on a single computer or workstation ('Computer')." (Docket #90, Ex. 2 ¶ 102). The clear import of this language is that, barring any roaming user policy or personal user exception, the Medical College was required to purchase a license for each installation of Reflection software. Thus, because the Medical College installed more Reflection software than which it had license to, the Medical College has breached Section 1 of the Reflection 10 EULA, and the appropriate damage award for that claim must be determined at trial.

On the other hand, the Court cannot decide whether the Medical College breached Section 4 of the Reflection 10 EULA by failing to implement internal safeguards to prevent unauthorized copying, distribution, or use of

---

[34]Finally, the Medical College argues, in its opposition to Attachmate's motion for partial summary judgment, that the statute of limitations bars any breach of contract that it committed with respect to the Reflection for HP 10 and Reflection for IBM 10. (Docket #111, Ex. 1 at 28). A statute of limitations defense is an affirmative defense, which the Medical College failed to raise in its answer. (Docket #38). The Medical College has raised this issue too late, and, in any case, has failed to meet its burden to prove that defense. *See Dep't of Revenue v. Puget Sound Power & Light Co.*, 103 Wash.2d 501, 504–05, 694 P.2d 7 (1985) (holding that a party who fails to assert a statute of limitations affirmative defense in its answer or amended answer waives that defense unless it is central to the litigation); (*see also* Docket #111, Ex. 3 ¶¶ 91-92) (explaining that the Medical College does not know how or when it installed these two programs).

Reflection software. Thus, liability and damages for that claim must also be resolved at trial.

### 2.3.2 Copyright Infringement

"To establish copyright infringement, one must prove two elements: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *JCW Investments, Inc. v. Novelty, Inc.*, 482 F.3d 910, 914 (7th Cir. 2007) (internal citations omitted).

The parties do not dispute that Attachmate owns valid copyrights to its Reflection 10 software. (Docket #61 ¶¶ 139, 141, 143, 145). The Medical College argues, however, that, in light of its status as a non-exclusive licensee, it is entitled to summary judgment with respect to Attachmate's copyright claim. (Docket #46) (citing *Graham v. James*, 144 F.3d 229, 236 (2d Cir. 1998)) ("A copyright owner who grants a nonexclusive license to use his copyrighted material waives his right to sue the licensee for copyright infringement.") (internal citations omitted). Attachmate argues that this argument fails because: (1) from a procedural stand point, the Medical College failed to raise this affirmative defense in its answer; and (2) from a substantive perspective, the Medical College exceeded the scope of its non-exclusive licenses. (Docket #60 at 19).

First, the Court finds that the Medical College's declaratory judgment claim of non-infringement placed Attachmate on sufficient notice that the Medical College would be defending any copyright claim with its licenses. (*See* Docket #1 ¶ 33) (explaining that "[a]ny claims for copyright infringement brought by Attachmate are barred, as [the Medical College] is licenced to use the works…at issue"); *Heller Fin., Inc. v. Midwhey Powder Co.*, 883 F.2d 1286,

1294 (7th Cir. 1989) ("Affirmative defenses will be stricken only when they are insufficient on the face of the pleadings.").

Second, the Court concludes that an award of summary judgment to the Medical College on this copyright claim would be inappropriate in light of the Court's holding that the Medical College breached Section 1 of the Reflection 10 license agreement. *See I.A.E., Inc. v. Shaver*, 74 F.3d 768, 775 (7th Cir. 1996) (A "licensee violates the copyright by exceeding the scope of this license"); *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1087 (9th Cir. 1989) ("A licensee infringes the owner's copyright if its use exceeds the scope of its license.").

Thus, the question of whether the Medical College infringed Attachmate's copyrights, and what damages Attachmate may be entitled to in light of a potential infringement, must be resolved at trial.[35]

### 2.3.2   Implied Covenant of Good Faith and Fair Dealing

The Medical Colleges claims that Attachmate violated the implied covenant of good faith and fair dealing by "misrepresent[ing] the EULA in an effort to coerce" the purchase of additional licenses "or face expensive litigation." (Docket #90, Ex. 1 at 29). Moreover, the Medical College argues that Attachmate did not have authority to demand that the Medical College purchase additional licenses, much less within a 30-day time frame at the price quoted by Attachmate. (Docket #90, Ex. 1 at 29; Docket #102, Ex. 1 at 14). In this sense, the Medical College argues that Attachmate's "extreme

---

[35]The Medical College argues that Attachmate cannot prove statutory or actual damages with respect to its copyright infringement claim. (Docket #102, Ex. 1 at 13-14). However, as discussed above, there are multiple disputes of fact as it relates to actual damages and, as such, the Court finds that the resolution of these damages arguments is more appropriately left for trial.

Case 2:15-cv-00151-JPS   Filed 02/19/16   Page 40 of 45   Document 113

position based on an inherently unreasonable interpretation of the EULA" frustrated the purchase of the license agreement. (Docket #90, Ex. 1 at 29).

Attachmate responds that the Medical College's claim is vague and amorphous and cannot stand as a matter of law. (Docket #42 at 11-12). Specifically, Attachmate argues that the Medical College's claim is not associated with any contractual obligation imposed by the EULA and instead attempts to punish Attachmate for identifying a breach and negotiating its resolution. (Docket #42 at 11-12). Moreover, Attachmate claims that the Medical College has suffered no damage as a result of the alleged breach of the implied covenant. (Docket #60 at 21).

The Court concludes that the Medical College's claim does not tie Attachmate's conduct to any contractual duty set forth in the EULA and, therefore, the Medical College's free-floating good faith claim must fail as a matter of law.

Under Washington law, the implied covenant of good faith and fair dealing applies to all contracts. *See Badgett v. Sec. State Bank*, 116 Wash. 2d 563, 569, 807 P.2d 356, 360 (1991). Moreover, this duty "arises when one party has discretionary authority to determine a future contract term." *Rekhter v. State, Dep't of Soc. & Health Servs.*, 180 Wash. 2d 102, 112, 323 P.3d 1036, 1041 (2014). In essence, this doctrine ensures that parties "cooperate with each other so that each may obtain the full benefit of performance." *Badgett*, 116 Wash. 2d at 569.

However, "[t]he implied covenant of good faith and fair dealing cannot add or contradict express contract terms and does not impose a free-floating obligation of good faith on the parties." *Hard 2 Find Accessories, Inc. v. Amazon.com, Inc.*, 58 F. Supp. 3d 1166, 1173 (W.D. Wash. 2014). Instead

Case 2:15-cv-00151-JPS   Filed 02/19/16   Page 41 of 45   Document 113

of "inject[ing] substantive terms into the parties' contract," the duty "requires only that the parties perform in good faith the obligations imposed by their agreement." *See Badgett*, 116 Wash. 2d at 569; *Johnson v. Yousoofian*, 84 Wash.App. 755, 762, 930 P.2d 921 (1996) ("The implied duty of good faith is derivative, in that it applies to the performance of specific contract obligations. If there is no contractual duty, there is nothing that must be performed in good faith.") (internal citations omitted). In this sense, the implied covenant is not "a free-floating duty of good faith unattached to the underlying legal document." *Badgett*, 116 Wash. 2d at 570.

The Medical College's theory of breach relates to the manner in which Attachmate conducted license negotiations following the Reflection software audit. (Docket #90, Ex. 1 at 30). The problem with the Medical College's claim, however, is that the license agreements between the parties do not contain *any* terms related to how license prices are to be determined and/or how the parties are obligated to resolve compliance disputes. Unlike *Rekhter,* where the plaintiffs' contracts explicitly gave the defendants discretion to determine future payment terms, the Medical College does not point the Court to a specific contractual obligation that Attachmate failed to perform in good faith. *Rekhter*, 180 Wash. 2d at 113 (2014) (explaining that the defendant "ha[d] a specific contractual obligation to determine and pay providers for hours authorized in the service plans"); *see also Fagerstrom v. Amazon.com, Inc.*, No. 15-CV-96-BAS-DHB, 2015 WL 6393948, at *3 (S.D. Cal. Oct. 21, 2015) (finding, under Washington law, that a contract provision which stated that the defendant "reserve[d] the right to make changes to our site, policies, Service Terms, and these Conditions of Use at any time" was discretionary); *McDermott v. Avaya, Inc.*, No. C13-6050 BHS, 2015 WL

1650291, at *6 (W.D. Wash. Apr. 14, 2015) ("It is undisputed that Avaya reserved the right to amend commissions 'solely at its discretion.'"); *Goodyear Tire & Rubber Co. v. Whiteman Tire, Inc.*, 86 Wash. App. 732, 741, 935 P.2d 628, 633 (1997) ("[T]he contract provision reserving Goodyear's right to sell in Whiteman's trade area is not stated by reference to a certain context. It is unconditional, and, does not call for the exercise of discretion and the consequent implied covenant to exercise that discretion in good faith."). The Court cannot read discretion into a contract term that does not exist. *Cf. Badgett*, 116 Wash.2d at 570 ("As a matter of law, there cannot be a breach of the duty of good faith when a party simply stands on its rights to require performance of a contract according to its terms."). Without any underlying obligation—discretionary or otherwise—from which to base its allegations, the Medical College simply cannot proceed as a matter of law on an implied covenant of good faith and fair dealing claim.

### 2.4    Conclusion

The undisputed facts reveal that the Medical College has breached Section 1 of the Reflection 10 EULA by installing excessive copies for that software without having licenses to do so. These installations constitute a breach of contract, for which damages will be determined at trial. In light of this conclusion, both liability and damages for Attachmate's copyright claim must likewise be resolved by a jury. However, the Court cannot say as a matter of law that the Medical College breached Section 4 of the EULA and, thus, the parties must resolve both liability and damages for that claim at trial as well. Due to the fact that the Medical College's implied covenant of good faith and fair dealing claim is not tied to a contractual duty imposed on

Attachmate by the parties' license agreements, that claim fails as a matter of law.

3.    CONCLUSION

To conclude, the Court will grant Attachmate's motion to dismiss the Medical College's WDTPA claim (Docket #28) because the Medical College has a "particular relationship" with Attachmate in light of the parties' licensing agreements for Reflection software. *See* Wis. Stat. Ann. § 100.18. Moreover, the Court will grant Attachmate's motion for partial summary judgment as follows: (1) resolving liability on its claim for contract liability under Section 1 of the EULA in its favor; and (2) dismissing the Medical College's claim for a breach of the implied covenant of good faith and fair dealing. (Docket #41). The Court will not, however, grant Attachmate's motion for partial summary judgment with respect to liability under Section 4 of the EULA. (Docket #41). Finally, because this Court concludes that the Medical College breached Section 1 of the Reflection 10 license agreements, the Court will deny the Medical College's motion for summary judgment with respect to Attachmate's copyright claim. (Docket #46).

This leaves open the following issues for resolution at trial: (1) whether the Medical College breached its duty to implement internal safeguards to prevent unauthorized copying, distribution, or use of Reflection software under Section 4 of the EULA (and the damages flowing therefrom); (2) the determination of an appropriate damage award for the Medical College's breach of Section 1 of the EULA; and (3) liability and damages with respect to Attachmate's copyright claim.

Accordingly,

IT IS ORDERED that Attachmate's motion to dismiss the Medical College's WDTPA claim (Docket #28) be the same is hereby GRANTED;

IT IS FURTHER ORDERED that Attachmate's motion for partial summary judgment (Docket #41) be the same is hereby GRANTED in part with respect to liability under Section 1 of the EULA and DENIED in part with respect to liability under Section 4 of the EULA; and

IT IS FURTHER ORDERED that the Medical College's motion for summary judgment (Docket #46) be the same is hereby DENIED.

Dated at Milwaukee, Wisconsin, this 19th day of February, 2016.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge

Case 2:15-cv-00151-JPS   Filed 02/19/16   Page 45 of 45   Document 113